STATE OF NEBRASKA, APPELLANT AND CROSS-APPELLEE, V.
STEVEN R. BLAIR, APPELLEE AND CROSS-APPELLANT.
707 N.W.2d 8

Filed November 15, 2005.    No. A-03-942.

Thomas J. Garvey and Michael F. Maloney for appellant.

Robert A. Wright, Jr., of Wright & Wright, and, on brief, Sherie E. Cotton for appellee.

SIEVERS, CARLSON, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

The State of Nebraska appeals from an order of the district court for Douglas County granting postconviction relief, consisting of a new trial, to Steven R. Blair. The State filed a notice of appeal 2 days after the district court entered its order, and 5 days later, Blair filed a motion to alter or amend the judgment. Because under these circumstances, Neb. Rev. Stat. § 25-1912(3) (Cum. Supp. 2004) declares that the State's notice of appeal "shall have no effect" and requires that a new notice of appeal be filed within the prescribed time after the entry of an order ruling on the motion, we lack jurisdiction over the purported appeal.

## BACKGROUND

### TRIAL AND DIRECT APPEAL

An amended information charged Blair with kidnapping, use of a deadly weapon to commit a felony, and terroristic threats arising out of events occurring on May 12, 1997. The information also charged Blair with failure to appear, but this charge was severed from the other counts at the outset of the trial. Represented by Marc Delman, Blair waived his right to a jury trial and a bench trial was held.

At trial, Patty Dory testified that on the evening of May 11, 1997, she and Blair argued, Blair telephoned and paged her repeatedly, Blair demanded that she come to his house, and Blair said Dory knew what Blair would do if she did not comply. Dory testified that she understood Blair's comment to mean Blair would shoot her and that she eventually agreed to go to Blair's house out of fear Blair would harm her or her family. Dory testified that Blair was waiting on the front steps to her house and that she drove her car to Blair's house, with him following in his van. Dory testified that once they arrived at Blair's house, Blair positioned himself in the doorway and held a shotgun. After Dory entered the house, Blair began beating her. She testified that Blair began slashing the couch upon which she had been sitting, and pictures of a "slashed" couch were received into evidence.

At some point, Dory called her sister, Lori Anzaldo. When the telephone call got disconnected, Anzaldo called back and Blair answered. Anzaldo threatened to call the police if Dory did not arrive at Anzaldo's house within 10 to 15 minutes. Blair allowed Dory to leave, and Dory went to Anzaldo's house. Anzaldo called the police, and the police went to Anzaldo's house in response to the call.

Officer Jason Christensen of the Omaha Police Department testified that while other Omaha police officers were arresting Blair, Christensen stepped into the front door of Blair's house, because Christensen had "heard there was a couple other people sitting in the house." Christensen observed a shotgun, which he discovered was loaded, leaning against the wall at the bottom of a staircase. Christensen also testified that a rifle was found in

Blair's house. There was considerable testimony about holes in the walls of Blair's house which may have been caused by a gunshot, but there was no evidence that Blair fired a gun inside his house on the dates at issue in this case. Christensen's testimony included some confusion over the time he went to Blair's home to assist with the arrest. He testified that it was around 5 p.m., but then stated that 8 p.m. would be correct if that is what his report indicated. Other officers testified that they responded to the situation between 5 and 6 p.m. Officer Jeffrey L. Morgan searched Blair's house pursuant to a search warrant and found a knife which matched Dory's description of the knife Blair threatened her with and then used to cut up his couch.

Blair denied holding Dory against her will, threatening her life, or beating her. He testified that the van Dory alleged he drove that night was not drivable at the time. According to Blair, he had been watching television in his bedroom in the early morning hours of May 12, 1997, when Dory came to his house, let herself in, and entered his bedroom. They allegedly got into an argument over a rental car which Dory had failed to return on time. Blair maintained Dory told him that her boyfriend had beaten her and taken the money Blair had given her for the car.

Blair testified that on May 12, 1997, he spent "practically all day" working at his family's business, a self-service laundry facility (laundromat) and adjoining pizza restaurant. A friend of Blair testified that he saw Blair at the laundromat between 9 and 10 a.m. on May 12. Blair's brother, Kenneth Wayne Blair (Kenneth), testified that he saw Blair at the laundromat between 10 and 10:30 a.m. on May 12 and that he and Blair then went to Blair's house, where Kenneth had recently been staying. Kenneth testified that when he finished moving, he dropped Blair off at the laundromat at 11 or 11:30 a.m.

Blair testified that he finished working at the laundromat at about 4 p.m. on May 12, 1997. At that time, he and "Deborah," whom Blair described as his "little helper," went to his house, and Dory was still there. Blair testified that Anzaldo telephoned for Dory and that Dory stated Anzaldo would be coming over to pick up Dory. Blair objected because he did not get along with Anzaldo. Blair testified that Anzaldo then told Dory that she would call the police on Blair. Blair testified that he, Dory, and

"Deborah" all left the house together and that there did not seem to be anything wrong with Dory at that time.

At the end of the trial, the district court made several comments, some of which follow:

> From the evidence, it appears to this Court that the credibility of [Dory] and [Dory's] witnesses is corroborated to some extent by the police officers who do not have any interest in the outcome of the litigation insofar as the Court considers. And contrary to that, [Blair's] credibility, I feel, is inadequate and that it is not corroborated fully.
>
> . . . And, of course, the witness, Deborah, who did not appear here, obviously, she could have had very material evidence, but was not called by the defense.
>
> So it's going to be the judgment of the Court and the finding of the Court by evidence beyond a reasonable doubt that [Blair] is guilty of the crime of kidnapping in the first count; guilty of the second count of using a weapon to commit a felony; and third count, the terroristic threats on the part of the defendant.

Blair filed a motion for new trial on April 27, 1998, through a new attorney who also represented Blair on direct appeal. The motion alleged that "an irregularity in the proceedings occurred as a result of the prosecutor's threat to have a witness for [Blair] arrested on an outstanding warrant if she took the stand." The affidavits of Delman and Deborah Wright were attached to the motion. Delman's affidavit stated that he "was informed by [the State's attorney] that if he called . . . Wright as a witness to testify on behalf of [Blair], that [the State's attorney] would have her arrested as there was a current outstanding warrant for her arrest." The court denied the motion.

A district court judge different from the judge who heard the evidence at trial sentenced Blair to 10 to 15 years' imprisonment for the kidnapping conviction and 3 to 5 years' imprisonment for the use of a deadly weapon to commit a felony conviction, to run consecutively, and 4 to 5 years' imprisonment for the terroristic threats conviction, to run concurrently with the other two sentences.

Blair timely appealed, alleging that the trial court erred (1) in finding him guilty of kidnapping upon insufficient evidence, (2)

in not granting a new trial on the basis of newly discovered evidence, and (3) in determining that Blair knowingly, voluntarily, and intelligently waived his right to a jury trial. In a memorandum opinion, this court affirmed the decision of the district court. See *State v. Blair*, 8 Neb. App. xvi (No. A-98-732, Mar. 31, 1999).

### POSTCONVICTION

Blair filed an amended motion to set aside his convictions and sentences, alleging that both trial counsel and appellate counsel provided ineffective assistance in numerous respects.

The court held an evidentiary hearing on Blair's application for postconviction relief and received into evidence numerous exhibits.

Wright testified that on the date of Blair's trial, Delman "pushed me out of the courtroom and told me I couldn't testify because the prosecuting attorney was going to arrest me because I had a warrant." She obtained a printout showing that there were no warrants for her arrest and showed such printout to Delman, but Delman did not call her to testify. Wright testified that had she been called as a witness, she would have testified that she was with Dory and Blair from noon or 1 p.m. until 4 or 5 p.m. on May 12, 1997, and Wright would have verified that Dory was not being held against her will during those hours. Wright testified that Dory and Blair "were fine" and that they "had a good time." Wright could not recall any arguments between Dory and Blair about another male acquaintance of Dory. Wright testified that Blair left the laundromat sometime after 5 p.m. and that Dory had not gone back to the laundromat with Wright and Blair. Based upon Wright's conversation with Delman, it was her understanding that Delman did not call her to testify because of the prosecutor's threat to have her arrested. Wright testified that Delman had taken her deposition prior to trial and knew what Wright's testimony would have been. Wright remained in the courtroom until the trial was over and was not arrested. Blair's mother testified that she told Delman to call Wright as a witness and that if Wright was arrested, Blair's mother would "get her out and put her on the stand anyway."

The prosecutor testified she told Delman that she ran Wright's record, that Wright had a misdemeanor warrant, and that the

prosecutor would have to alert the sheriff's department. She testified that she provided such information to Delman as a matter of professional courtesy and that the warrant could have been taken care of prior to any testimony by Wright.

Delman testified that he informed Blair and his mother of the alleged warrant for Wright's arrest and that it was Blair and his mother's decision not to call Wright to testify. Delman testified that he used a computer to check for warrants for Wright and could not find any, but the prosecutor again said that there was an active warrant. Delman did not believe that in speaking with Wright, Delman discouraged Wright from testifying. Delman thought Wright's testimony would be helpful to Blair's case.

The court received into evidence Forest Roper's affidavit, signed on September 30, 1999. The affidavit states that Roper spoke with Delman in April 1998 regarding testifying on Blair's behalf; that Roper voluntarily appeared in court on April 14, 1998, to testify on Blair's behalf; that Roper was not called as a witness; that had Roper been called as a witness, he would have testified that he was present with both Dory and Blair on May 11, 1997, between approximately 7 and 9 p.m.; that between those hours, Blair was working at the laundromat; that between those hours, Dory, Blair, and another female were drinking beer in the office; that Roper and a friend of Blair were watching television in the laundromat while Roper washed and dried his comforter; that at approximately 9 p.m., Roper "as well as the others walked out of the laundr[o]mat, got in our vehicles and left"; and that Dory and Blair were in good spirits at the time Roper left. At the evidentiary hearing, Roper testified that he never observed Blair make any threatening telephone calls. Roper believed that at the time he left the laundromat, Dory, Blair, and Wright were still there. Delman testified that he decided not to call Roper to testify because all Roper could basically testify to was having seen Blair and Dory prior to the alleged incident and that "it wasn't germane to the case, nor would it have been that beneficial."

In an order filed August 11, 2003, the court stated:

> Of all the grounds for postconviction relief raised by [Blair] in his amended application, the Court finds that [Blair] has sustained his burden of proof as to his allegation that he was rendered ineffective assistance of counsel,

prejudicial to his defense, in failing to produce . . . Wright or . . . Roper as defense witnesses at [Blair's] trial.

The court reasoned that Wright's testimony would have "substantially contradicted" Dory's testimony, would have "brought into issue Dory's credibility," and "might have" affected Dory's credibility to the extent that the court could "find reasonable doubt as to [Blair]'s guilt." It thus found that Blair's counsel was ineffective in failing to call Wright as a witness, in failing to properly preserve the record if Wright was not called due to prosecutorial misconduct, and in failing to properly present Wright's evidence on Blair's motion for new trial by offering an affidavit rather than live testimony subject to cross-examination.

The court stated that because the State depended on Dory's credibility, Roper would have been "a critical witness," since his testimony would have been in direct conflict with Dory's testimony. Because Delman testified that he determined Roper's testimony was not relevant, the court found that Blair was further denied effective assistance of counsel by Delman's failure to call Roper as a witness. The court set aside the judgment of conviction and Blair's sentencing, and the court ordered a new trial.

### NOTICES OF APPEAL AND OTHER MOTIONS

The court's order granting Blair postconviction relief was file stamped on August 11, 2003. On August 13, the State filed a notice of appeal regarding that order. Such appeal was docketed in our court on August 18 as case No. A-03-942 and is the appeal now before us.

On August 18, 2003, Blair moved the district court to alter or amend its order. In an order file stamped on October 10, the trial court declined to consider Blair's motion to alter or amend, due to the court's belief that it lacked jurisdiction to rule on the motion. Blair filed a notice of appeal from that order on September 26, which appeal was docketed as case No. A-03-1137. This court dismissed that appeal, citing the rule that when a lower court lacks authority to exercise jurisdiction, the appellate court also lacks power to determine the merits of the case. However, on September 14, 2005, this court recalled the mandate in case No. A-03-1137, and on October 11, this court ordered that the appeal in that case proceed.

On November 7, 2003, the State deposited $75 and filed a notice of appeal "to fully preserve and perfect its appeal should the Court of Appeals determine that [Blair's] 'Motion to Alter and Amend' did change the time for filing a Notice of Appeal." That appeal was docketed as case No. A-03-1295. Such notice was filed within 30 days after the trial court's order ruling on the motion to alter or amend. This court dismissed the appeal in that case as well.

Blair filed a motion for summary dismissal of the instant appeal and asserted in his brief on appeal that this court lacked jurisdiction to hear the appeal. Although this court overruled Blair's motion for summary dismissal, we granted additional time for the State to file a reply brief responding to Blair's argument concerning jurisdiction.

## ASSIGNMENTS OF ERROR

The State alleges that the trial court erred (1) in finding that Blair's trial attorney provided ineffective assistance of counsel and (2) in applying an incorrect standard in determining whether counsel's alleged errors prejudiced Blair.

On cross-appeal, Blair alleges that the trial court erred (1) in failing to include as a basis of ineffective assistance of counsel the failure of trial defense counsel to conduct discovery and to file a motion to suppress and (2) in failing to include as finding in support of a motion for new trial that prosecutorial misconduct occurred by the prosecutor's presentation of evidence which the prosecutor knew or should have known to be false.

In a supplemental brief on cross-appeal, filed well over a year after Blair's original brief on cross-appeal, Blair alleges (1) that the court erred by failing to rule on the issue of prosecutorial misconduct for failure to disclose under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the 911 emergency dispatch service data and the medical records of Dory's emergency hospital visits and (2) that postconviction counsel failed to provide effective assistance to Blair on issues raised in the motion to set aside convictions and sentences.

## STANDARD OF REVIEW

A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court

will not be disturbed unless they are clearly erroneous. *State v. Perry*, 268 Neb. 179, 681 N.W.2d 729 (2004).

■ Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005).

## ANALYSIS

■ Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Id.* Blair previously moved for summary dismissal of this appeal on the bases that the trial court's order granting a new trial was an interlocutory order and that the State's notice of appeal was ineffective because Blair timely filed a motion to alter or amend the judgment. We now conclude that the second allegation of Blair's motion, which has been fully briefed by the parties, requires that the appeal be dismissed for lack of jurisdiction.

■ In order to initiate an appeal, a notice of appeal must be filed within 30 days after entry of the judgment, decree, or final order. § 25-1912(1). Section 25-1912(3) states in part:

The running of the time for filing a notice of appeal shall be terminated as to all parties (a) by a timely motion for a new trial under section 25-1144.01, *(b) by a timely motion to alter or amend a judgment under section 25-1329*, or (c) by a timely motion to set aside the verdict or judgment under section 25-1315.02, and the full time for appeal fixed in subsection (1) of this section commences to run from the entry of the order ruling upon the motion filed pursuant to subdivision (a), (b), or (c) of this subsection. When any motion terminating the time for filing a notice of appeal is timely filed by any party, a notice of appeal filed before the court announces its decision upon the terminating motion

> *shall have no effect, whether filed before or after the timely filing of the terminating motion.*

(Emphasis supplied.)

■ Neb. Rev. Stat. § 25-1329 (Cum. Supp. 2002) provides: "A motion to alter or amend a judgment shall be filed no later than ten days after the entry of the judgment." Thereafter, the 30-day appeal period begins to run from the entry of an order ruling upon the motion to alter or amend a judgment. See, § 25-1912(3); *DeBose v. State*, 267 Neb. 116, 672 N.W.2d 426 (2003). In order to qualify for treatment as a motion to alter or amend the judgment, the motion must seek substantive alteration of the judgment. *Weeder v. Central Comm. College*, 269 Neb. 114, 691 N.W.2d 508 (2005).

Pursuant to § 25-1912(3), when any terminating motion such as the motion to alter or amend is timely filed, a notice of appeal filed before the court announces its decision upon the terminating motion shall have no effect, whether filed before or after the timely filing of the terminating motion. That section further states that a new notice of appeal shall be filed within the prescribed time after the entry of the order ruling on the motion.

Blair's motion to alter or amend the judgment alleged that the trial court failed to make findings of fact and conclusions of law pursuant to Neb. Rev. Stat. § 25-1127 (Reissue 1995) regarding certain allegations of Blair's amended motion for postconviction relief. In Blair's operative motion to set aside the convictions and sentences, he specifically requested that pursuant to § 25-1127, the court set forth its conclusions of fact separately from its conclusions of law. While we acknowledge that Blair's citation to § 25-1127 was inapposite, the statute governing a motion for postconviction relief, Neb. Rev. Stat. § 29-3001 (Reissue 1995), explicitly requires the trial court, after an evidentiary hearing on such motion, to make findings of fact and conclusions of law.

The State argues that Blair's August 18, 2003, motion to alter or amend the judgment did not void the State's August 13 notice of appeal because Blair's motion did not seek a substantive change in the court's August 11 order. In *Strong v. Omaha Constr. Indus. Pension Plan*, 270 Neb. 1, 701 N.W.2d 320 (2005), the appellant filed a motion seeking an order granting a new trial and any other relief deemed equitable and just. The Nebraska

Supreme Court determined it had jurisdiction, stating: "In effect, [the appellant] requested that the court reconsider its grant of summary judgment. A motion for reconsideration is the functional equivalent of a motion to alter or amend a judgment." 270 Neb. at 6, 701 N.W.2d at 326, citing *Woodhouse Ford v. Laflan*, 268 Neb. 722, 687 N.W.2d 672 (2004). In *Weeder v. Central Comm. College, supra*, the appellant asked the district court to " 'reexamine its decision to dismiss . . . and reinstate the action as previously filed.' " 269 Neb. at 120, 691 N.W.2d at 513. The Nebraska Supreme Court concluded that such language sought substantive alteration of the judgment of the trial court dismissing the appellant's action.

In the instant case, the relief sought by Blair was that the court "alter and amend it's [sic] Order by making findings of facts and conclusions of law on trial counsel's ineffective assistance regarding [Blair's] illegal arrest and unlawful search and seizure, and for any other relief the Court deems just and proper." The court's order granting postconviction relief is silent on these issues, and thus, Blair's request seeks a substantive change to the court's order. See *State v. Costanzo*, 235 Neb. 126, 454 N.W.2d 283 (1990). When a motion terminating the 30-day appeal period is filed, a notice of appeal filed before the court announces its decision upon the terminating motion has no effect and an appellate court acquires no jurisdiction. *State v. Bellamy*, 264 Neb. 784, 652 N.W.2d 86 (2002). Because Blair's motion terminated the 30-day appeal period, the State's notice of appeal was ineffective. Accordingly, we lack jurisdiction over this purported appeal.

## CONCLUSION

We conclude that Blair's motion to alter or amend the judgment terminated the appeal period and that the State's notice of appeal, filed before disposition of the terminating motion, became ineffective. This court therefore lacks jurisdiction over the State's purported appeal and Blair's purported cross-appeal.

APPEAL DISMISSED.